# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 18, 2019      Decided December 20, 2019

No. 17-1262

NORTHERN VIRGINIA ELECTRIC COOPERATIVE, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

Consolidated with 17-1265, 18-1230, 18-1234

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Adrienne E. Clair* argued the cause for petitioners. With her on the briefs were *Rebecca L. Shelton*, *Alan I. Robbins*, and *Debra D. Roby.*

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor. *Anand Viswanathan*, Attorney, entered an appearance.

2

*Christopher R. Jones* argued the cause for intervenor Virginia Electric and Power Company.  With him on the brief was *Miles H. Kiger*.

*Sean T. Beeny*, *Denise C. Goulet*, and *Phyllis G. Kimmel* were on the brief for intervenor North Carolina Electric Membership Corporation in support of respondent.

Before: GARLAND, *Chief Judge*, WILKINS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  In the mid to late 2000s, the Virginia Electric and Power Company (known in this case by its trade name, "Dominion") sought to construct three projects to upgrade its electricity transmission grid.  The state of Virginia required Dominion to place the new transmission wires underground rather than use cheaper overhead wiring, thereby increasing the cost of the three projects from about $84 million to $233 million in total.  Dominion serves customers in both Virginia and North Carolina.  This case involves a simple question:  How should the cost of undergrounding be allocated among Dominion's customers?

In a series of proceedings, the Federal Energy Regulatory Commission concluded that Dominion's Virginia customers, but not its North Carolina customers, should bear those costs; the evidence showed that Virginia customers benefited from the undergrounding, while no evidence showed that North Carolina customers benefited.  In the Commission's words, this decision represented "a limited exception" to a general principle that all of a utility's customers should share the costs of upgrading the grid.  *Old Dominion Elec. Coop.*, 146 FERC 61,200 ¶ 52 (2014) ("Allocation Order"), *reh'g denied*, 161

3

FERC 61,055 (2017) ("First Order on Rehearing"); see also *Old Dominion Elec. Coop.*, 161 FERC 61,054 (2016), *reh'g denied*, 164 FERC 61,006 (2018) ("Second Order on Rehearing").

In this petition, Virginia power wholesalers who buy electricity from Dominion challenge the Commission's decision on procedural and substantive grounds. None of them persuades us. We tackle first the procedural theories, then the substantive ones.

## I.

The petitioners argue: (1) that the Commission did not properly invoke its power under § 206 of the Federal Power Act, 16 U.S.C. § 824e; (2) that the Commission failed to provide adequate notice of its intent to modify Dominion's filed rate; and (3) that the Commission's administrative law judge misinterpreted a Commission order and thereby improperly cabined the scope of an evidentiary hearing.

1. The claim that a proper § 206 proceeding was missing turns on special rules relating to Commission supervision of formula rates—the sort used by Dominion. The formula rate, filed as a tariff with the Commission, identifies the categories into which Dominion's costs fall. With the formula in place, Dominion files an annual update informing the Commission and its customers of the projected costs for each category in the formula. Unless modified by the Commission, Dominion recovers the costs under the formula rate, subject to a later true-up procedure. See *Virginia Elec. & Power Co.*, 123 FERC 61,098 ¶ 6 (2008) ("Order Approving Formula").

At least in Dominion's case, the tariff creates a procedure, known as a "Formal Challenge," through which a customer can challenge the legitimacy of inputs. See *id*. ¶ 16 (describing the

4

Formal Challenge process).  (We use initial capitals for the name, to emphasize that it is a word of art and not, so far as we can determine, based on any especially high level of formality.)  Although the parties here have spoken and written as if such a Formal Challenge were located under § 206, see, e.g., Oral Argument at 8:23, it seems more accurately akin to a continuation of the § 205 proceeding in which the utility files its formula rate.  See 16 U.S.C. § 824d.  That's because the annual update supplements the utility's initial § 205 filing, which is simply a formula without the necessary inputs.  Consequently, in a Formal Challenge, the utility not the complainant bears the burden of proving the justness and reasonableness of its inputs, just as the utility does when it first files the formula rate under § 205.  See Order Approving Formula, 123 FERC 61,098 ¶ 47 (noting that those who launch a Formal Challenge to Dominion's annual update do not bear the burden of proof); cf. *Midwest Indep. Transmission Sys. Operator, Inc.*, 143 FERC 61,149 ¶ 120 n.199 (2013) (citing § 205 on this point regarding a different tariff).  In contrast, in a conventional § 206 proceeding, the complainants or the Commission must prove the unjustness and unreasonableness of the utility's rate.  See 16 U.S.C. § 824e(b) (placing the burden of proof "upon the Commission or the complainant").

For purposes of this case, there is a further key distinction between a Formal Challenge and a § 206 proceeding:  In a Formal Challenge proceeding, a party cannot advance "attacks on the formula rate itself" and cannot advocate "that expenses should be treated differently from how the formula prescribes."  *Delmarva Power & Light Co.*, 160 FERC 61,102 ¶ 19 (2017); see also *Ameren Ill. Co.*, 156 FERC 61,209 ¶ 71 (2016).

When Dominion filed its formula rate in 2008, it did not distinguish between its Virginia and North Carolina customers.  In its 2010 annual update, Dominion proposed including the undergrounding costs at issue here as inputs into the formula

5

rate for *all* its customers.  On March 17, 2010, Dominion's customers in both Virginia and North Carolina objected and instituted a Formal Challenge to the undergrounding costs' inclusion.  By its own terms, their complaint did not "seek [] to challenge the formula rate, but rather [to] challenge only the inputs into the formula rate for the 2010 Annual Update." J.A. 52.

The Virginia customers now argue that because they launched a Formal Challenge to the annual update's inputs—and not a standard § 206 proceeding—the Commission lacked the statutory authority to modify the formula rate itself so as to saddle the Virginia but not North Carolina customers with costs.

But in fact the Commission broadened the scope of the complaint proceedings.  On March 24, 2010, a week after Dominion's customers filed their Formal Challenge, Dominion responded by filing its own proposal under § 205 to assign those costs directly to its customers in case the Commission determined that Dominion could not include the costs in its existing formula rate.  See *Virginia Elec. & Power Co.*, 131 FERC 61,171 ¶¶ 1, 4, 18 (2010) ("May 20, 2010 Order").  To make sure that there was no meaningful gap between any grant of relief to the customers and its proposed recovery system, Dominion asked the Commission to waive the usual 60-day notice requirement (see § 205(d)) and establish a refund effective date that would allow it to collect a revised rate (if needed) as of March 25, 2010.  On May 20, 2010, the Commission "reject[ed] Dominion's [proposal] as unnecessary," May 20, 2010 Order ¶ 18, explaining:

> The effective date *for a change in the allocation of costs, i.e., ordering a different allocation of costs among customers as compared to the current allocation of costs*, if required at all, will be

6

> determined in the Complaint proceeding [the Formal
> Challenge] based on the requirements of section 206
> of the FPA as applicable to these circumstances.

*Id*. (emphasis added).

In announcing that these proceedings would determine a
refund effective date for "a different allocation of costs among
customers as compared to the current allocation of costs," the
Commission said that it considered the Formal Challenge
procedures too limited and sought, on its own initiative, to
invoke the broader powers of a conventional § 206 proceeding.
See 16 U.S.C. § 824e (permitting the Commission to initiate a
§ 206 proceeding "upon its own motion").  Tellingly, the
petitioners' briefs never grapple with the language of the May
20, 2010 Order.  See Appellant Br. 44 (alluding to the First
Order on Rehearing's reference to the Commission's rejection
of Dominion's § 205 filing but making *no* mention of the
Commission's initiation of its own proceeding under § 206 in
the May 20, 2010 Order).

At oral argument, petitioners' counsel argued that the
Commission could not possibly have acted to initiate a § 206
proceeding, because the Commission eventually set the refund
effective date as March 17, 2010, the day that the complainants
filed their Formal Challenge, see *Old Dominion Elec. Coop.*,
133 FERC 61,009 ¶ 36 (2010) ("October 2010 Order").  Where
the Commission files its own § 206 proceeding, the refund
effective date may "not be earlier than the date of the
publication by the Commission of notice of its intention to
initiate such proceeding." 16 U.S.C. § 824e(b).  By contrast, in
a proceeding on a party's complaint, the refund effective date
may be as early as the date of the complaint's filing.  See *id.*
Here, the Commission's May 20, 2010 Order post-dated the
complaint by about three months, and the Commission chose
the earlier date of the complaint as the refund effective date.

7

From the Commission's use of this earlier date, the petitioners would have us infer that the Commission never initiated its own § 206 proceeding.

Whatever merit may lie in this argument, the petitioners advanced it far too late. It does not appear in their briefs before us. See *Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015) ("Generally, arguments raised for the first time at oral argument are forfeited."). Nor, as far as we can tell, does it appear in an application for rehearing before the Commission. See 16 U.S.C. § 825*l*(b) (limiting judicial review, absent "reasonable ground," to objections "urged before the Commission in the application for rehearing"); *Save Our Sebasticook v. FERC*, 431 F.3d 379, 382 (D.C. Cir. 2005) (noting that 16 U.S.C. § 825*l*(b)'s exhaustion requirement ensures that "a reviewing court" gains "the benefit of the agency's expert view of why it thought the petitioner's arguments failed"). We thus decline to address it.

2. Petitioners next advance a related objection: As they see it, the Commission failed to provide the parties and the public adequate notice that it would consider requiring some, but not all, of Dominion's customers to pay for the undergrounding. See *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (noting that the Due Process Clause, the Administrative Procedures Act, and the Federal Power Act all require the Commission to provide notice). But the Commission's May 20, 2010 Order placed everyone on notice from the very beginning that the Commission might allocate the costs differently between Dominion's customers. See *supra*. That makes this case very different from *Public Service Commission*, the case on which petitioners principally rely. See Appellant Br. 40; Reply Br. 11–13. There, the Commission actively disclaimed its intention to adopt a particular policy, refused to develop a necessary factual record about the policy, but later reversed course and adopted the

8

policy anyway. See *id*. at 1012. Here, by contrast, from May 20, 2010 onward the Commission consistently contemplated ordering an allocation of costs different from the allocation in the filed formula rate.

What's more, the petitioners not only had notice but took advantage of the opportunity to litigate the cost allocation issue before the Commission. Consider the course of proceedings after the May 20, 2010 Order. In October 2010, the Commission issued an order concluding that the undergrounding costs "[do] not raise material issues of disputed fact." October 2010 Order, 133 FERC 61,009 ¶ 35. As a result, the Commission "reserved" the "determination" for itself and directed the parties to brief the issue if they could not settle. *Id.* They couldn't.

At this point, Dominion's North Carolina customers argued they should not bear any of the costs of undergrounding, because the state of Virginia mandated undergrounding for "local aesthetic reasons" which did not benefit anyone in North Carolina. J.A. 659; see *infra* Part II. The Virginia customers responded, urging the Commission to reject the North Carolina proposal. The Commission concluded that it would not be just and reasonable to stick the North Carolina customers with the costs and sent the matter to an administrative law judge to determine the appropriate amount of costs for the Virginia customers to bear. See Allocation Order, 146 FERC 61,200 ¶¶ 48–52.

This sequence of events provided the petitioners adequate notice and process.

3. This leads us to the third and final procedural objection. The petitioners argue that the Commission's order instructed the ALJ to decide whether Dominion's Virginia and North Carolina customers should bear the costs and to select a method

9

for assigning percentages of those costs to whoever would ultimately bear them. Thus, they say, it was error for the ALJ, approved by the Commission, to read the order as merely empowering the ALJ to determine the precise amount of costs to be born. See *Old Dominion Elec. Coop.*, 154 FERC 63,014 ¶ 36 (concluding "that the Commission has already decided the allocation issue"); Second Order on Rehearing, 164 FERC 61,006 ¶¶ 45, 63 (affirming the ALJ's interpretation of the order).

The Commission's order clearly refutes the claim. It stated that the North Carolina customers "have shown that it is not just and reasonable for wholesale transmission customers outside the Commonwealth of Virginia . . . to be allocated the incremental costs of undergrounding the Projects," and provided three pages of explanation. Allocation Order, 146 FERC 61,200 ¶¶ 48, 49–59. At the end of this discussion, the Commission then announced that "[t]he determination of the appropriate amount of undergrounding costs to be allocated to each [] customer for their Virginia loads in the Dominion Zone is a factual matter that cannot be properly calculated based on the filings made to date. The Commission will therefore establish a hearing, before an [ALJ], for the limited purpose of determining the appropriate assignment of those costs." *Id*. ¶ 56. The ALJ proceeded in full accord with this mandate.

II.

Finally, petitioners claim that the Commission acted arbitrarily by requiring Dominion's Virginia customers to bear the costs of undergrounding. We see nothing arbitrary in its conclusion.

The Commission has long adhered to the cost causation principle, under which a utility should assign costs to those customers who caused them or benefit from them. But "[w]hen

10

a system is integrated, any system enhancements are presumed to benefit the entire system." *W. Mass. Elec. Co. v. FERC*, 165 F.3d 922, 927 (D.C. Cir. 1999). Thus, in the mine run of cases, all customers on a grid benefit from—and share in—the costs of upgrading the grid. See *id*.

Here the Commission concluded that only Dominion's Virginia customers benefited from the incremental cost of undergrounding the three projects. As a result, only the Virginia customers should bear those costs. This created "a limited exception to [the Commission's] general policy that utilities do not directly assign individual cost items that are included in projects that have system-wide benefits." Allocation Order, 146 FERC 61,200 ¶ 52; Second Order on Rehearing, 164 FERC 61,006 ¶ 17 (affirming, a second time on rehearing, the "narrowly-crafted exception").

Indeed, as the Commission recognized, its departure from its policy of having all customers pay for upgrading a grid here *maintained* consistency with the broader cost causation principle: Though the benefits of conventional grid enhancement are shared throughout the grid, here Virginians uniquely caused and benefited from the undergrounding. See Second Order on Rehearing, 164 FERC 61,006 ¶ 28.

Under § 206, the Commission of course bore the burden of proving that the existing cost allocation was unjust and unreasonable, see 16 U.S.C. § 824e(b), as it expressly acknowledged, see First Order on Rehearing, 161 FERC 61,055 ¶ 30 n.75. Indeed, more than substantial evidence in the record supports the Commission's conclusion that Virginians but not North Carolinians benefited from undergrounding the three projects—all located in Virginia. For instance, according to a report by a hearing officer for a Virginia body which heard testimony regarding undergrounding, "one hundred sixty-seven public witnesses" testified at a hearing in Leesburg, Virginia,

11

"the overwhelming majority" speaking in favor of undergrounding one of the three projects. J.A. 226. The witnesses pointed to benefits they believed undergrounding would afford them, including better aesthetics and avoidance of electromagnetic radiation. A second report recounted similar testimony regarding a different project from dozens of Virginia residents and public officials, including their statements of belief that undergrounding would lessen the negative impact on local property values and the tax base.

The Commission also rested on the insistence of the Virginia legislature that Dominion underground all three projects. It noted that the costs were "a direct result of legislation [adopted by the Commonwealth of Virginia]. . . intended to benefit citizens of the Commonwealth of Virginia." Allocation Order, 146 FERC 61,200 ¶ 50.

The petitioners mainly contend that the Commission lacked affirmative evidence that North Carolinians didn't benefit from the undergrounding. See, e.g., Reply Br. 22. But this ignores (1) the mountain of evidence that Virginians clamored for the undergrounding; (2) the Virginia legislature's apparent intent to act for the benefit of its citizens; (3) the absence of any evidence that North Carolina customers caused or benefited from the undergrounding. Put it all together, and it adds up to substantial evidence that Virginians benefited from the undergrounding but North Carolinians did not.

Finally, the petitioners—Dominion's wholesale power customers—also complain that the Commission should have placed the cost on Dominion's retail customers and not on the wholesale power companies who purchase service from Dominion. See Appellant Br. 62. But they offer no evidence that their Virginia retail customers benefit any less than Dominion's Virginia retail customers, nor is there any obvious reason to think so.

12

\* \* \*

The petitions for review are

*Denied*.